(No. 48746.–
(No. 48758.–

THE COALITION FOR POLITICAL HONESTY *et al.*, Plaintiffs, v. THE STATE BOARD OF ELECTIONS *et al.*, Defendants.—ELMER GERTZ *et al.*, Appellees, v. THE STATE BOARD OF ELECTIONS *et al.*, Appellants.

*Announced Aug. 31, 1976.—Opinion filed Dec. 3, 1976.—Rehearing denied Jan. 28, 1977.*

SCHAEFER, J., dissenting.

Kenneth F. Levin, of Beatty, Levin & Holland, of Chicago, for plaintiffs.

John H. Bickley, Jr., of Bickley & Stern, and Franklin J. Lunding, Jr., and Michael E. Lavelle, all of Chicago, for defendants.

William J. Scott, Attorney General, of Chicago (Herbert Lee Caplan, Assistant Attorney General, of counsel), for appellants State Board of Elections *et al.*

Thomas R. Meites, of Chicago, for appellants Coalition for Political Honesty *et al.*

Ancel, Glink, Diamond & Murphy, O'Keefe, Ashenden & Lyons, and Witwer, Moran, Burlage & Atkinson, all of Chicago (Louis Ancel, Stewart H. Diamond, Gordon V. Levine, Thomas G. Lyons, and Samuel W. Witwer, of counsel), for appellees.

PER CURIAM: These consolidated cases involve an initiative petition proposing three amendments to article IV, the legislative article of the Illinois Constitution of 1970. In cause No. 48758 the plaintiffs, who are citizens and taxpayers of Illinois, filed an action in the circuit court of Cook County seeking to enjoin the State Board of Elections and other State and county officials from expending approximately $1,750,000 in public funds to determine the validity and sufficiency of the initiative petition and to arrange for and to conduct an election on the proposed amendments. The plaintiffs are Elmer Gertz, Thomas J. McCracken, Louis J. Perona, Lucy Reum, Maurice W. Scott and Elbert S. Smith, who served as delegates to the 1970 constitutional convention and Ann M. Lousin, who served as a member of the research staff of the convention. Plaintiff Louis J. Perona served as the spokesman for the Committee on the Legislature at the debates concerning the legislative initiative at the constitutional convention. The president of the 1970 constitutional convention, Samuel W. Witwer, represents the plaintiffs. His co-counsel is Thomas G. Lyons, who was a delegate and the vice president of the constitutional convention. Prior to the convention he served as the chairman of the Constitution Study Commission, which was created by the General Assembly to do preparatory work in the organization of the convention. The Coalition For Political Honesty (hereafter, the Coalition), an association that circulated the initiative petition throughout the State, was allowed to intervene in the proceeding as a defendant. The circuit court issued the injunction, holding the proposed amendments failed to meet the Constitu-

tion's requirements and also holding the petitions uncon-
stitutional under the Illinois and United States constitu-
tions. This court allowed the defendants' motion to
transfer their appeal from the appellate court to us under
our Rule 302(b). 58 Ill. 2d R. 302(b).

Cause No. 48746 was an original action brought in
this court (58 Ill. 2d R. 381) by the petitioner, the
Coalition, seeking a writ of *mandamus* directing the
respondents, the State Board of Elections and its members,
to certify the amendments proposed by the initiative
petition on or before September 2, 1976. We consolidated
the two cases for oral argument, which was heard on
August 23, 1976. On August 31, 1976, we announced our
affirmance of the circuit court's judgment in cause No.
48758, and that we were dismissing the petition for
*mandamus* in cause No. 48746. This opinion will state the
reasons for our holdings.

Article XIV of our constitution of 1970 provides the
methods by which the Constitution may be revised.
Section 3, which is relevant here, provides:

"CONSTITUTIONAL INITIATIVE FOR LEGISLATIVE
ARTICLE

Amendments to Article IV of this Constitution may
be proposed by a petition signed by a number of electors
equal in number to at least eight percent of the total votes
cast for candidates for Governor in the preceding guberna-
torial election. Amendments shall be limited to structural
and procedural subjects contained in Article IV. A
petition shall contain the text of the proposed amend-
ment and the date of the general election at which the
proposed amendment is to be submitted, shall have been
signed by the petitioning electors not more than twenty-
four months preceding that general election and shall be
filed with the Secretary of State at least six months
before that general election. The procedure for deter-
mining the validity and sufficiency of a petition shall be
provided by law. If the petition is valid and sufficient, the
proposed amendment shall be submitted to the electors at
that general election and shall become effective if
approved by either three-fifths of those voting on the

amendment or a majority of those voting in the election."
Ill. Const. 1970, art. XIV, sec. 3.

The initiative thus is limited to the legislative article. The proposed amendments would have been to three sections of article IV, the legislative article.

Proposal 1 would amend section 2(e) of article IV as follows (the language to be added under the amendment is in italics, and the language to be deleted is lined through):

> "No member of the General Assembly shall receive compensation as a public officer or employee from any other governmental entity for time during which he is in attendance *during his term* as a member of the General Assembly."

Proposal 2 would amend section 8(c) of article IV as follows (the added language is in italics):

> "No bill shall become a law without the concurrence of a majority of the members elected to each house. Final passage of a bill shall be by record vote. In the Senate at the request of two members, and in the House at the request of five members, a record vote may be taken on any other occasion. A record vote is a vote by yeas and nays entered on the journal. *A member who has a conflict of interest as a result of a personal, family, or financial interest in a bill shall disclose that interest to the house of which he is a member, and shall not vote thereon. A member so precluded from voting shall not be counted as an elected member on that vote.* "

Proposal 3 would amend section 11 of article IV as follows (the addition is italicized):

> "A member shall receive a salary and allowances as provided by law, *except that no member shall receive payments of salary in advance of performance of duties as a member of the General Assembly.* but Changes in the salary of a member shall not take effect during the term for which he has been elected."

The plaintiffs' complaint alleged that none of the three proposals conformed to the provisions of the Constitution which restrict the subject matter of constitutional amendments. The complaint noted that the second sentence of section 3 of article XIV states: "Amendments

shall be limited to structural and procedural subjects contained in Article IV." (Ill. Const. 1970, art. XIV, sec. 3.) The plaintiffs argued that this limitation requires that any amendments proposed under section 3 must be to effect changes in both the structure and procedure of subjects in article IV, the existing legislative article, and that none of the proposals satisfied this requirement. They contended that section 3 contemplated only amendments such as converting from multiple- to single-member legislative districts, changing provisions for cumulative to ones for normal voting for house members, or from a bicameral to a unicameral legislature—structural changes which would necessarily require additional procedural changes. The plaintiffs contended further that propositions 1 and 2 violated the due process and equal protection clauses of the constitutions of Illinois and the United States. Ill. Const. 1970, art. 1, sec. 2; U.S. Const., amend. XIV, sec. 1.

The circuit court granted the plaintiffs' motion for summary judgment. It held that to comply with the requirements of section 3 amendments proposed under the intitiative must be both "structural and procedural." The court considered that while each of the three proposals could arguably relate to procedural matters, none of them conformed to the combined requirement. It further held that proposal 1, which would preclude a member of the legislature from receiving compensation from another governmental entity during his term of office, violated the due process and equal protection clauses and that proposal 2, relating to conflicts of interest, was so vague and indefinite as to violate the due process clauses of both constitutions.

The defendants make several contentions on this appeal, challenging the circuit court's holding. They say first that the court improperly took jurisdiction and rendered an opinion in the "abstract," since the controversy was not "ripe" for decision. They contend that if the

initiative petition was proper as to form, having, for example, the proper number of valid signatures, the proposals must be submitted to the electorate and then approved by the electorate before a justiciable controversy exists. To support this contention they cite decisions to the effect that courts will not enjoin the holding of an election. *Slack v. City of Salem,* 31 Ill. 2d 174; *People ex rel. Schlaman v. Electoral Board,* 4 Ill. 2d 504; *Fletcher v. City of Paris,* 377 Ill. 89.

We do not consider those holdings are controlling. We are not concerned with an election or a legislative referendum, but rather, with the question whether proposed amendments to our constitution satisfy the Constitution's own requirements for its amendment. Article XIV, section 3, of the Constitution provides specific requirements for the proposing of amendments under the initiative procedure. The Constitution has an express limitation as to the subject matter of a proposal: "Amendments shall be limited to structural and procedural subjects contained in Article IV." Any offered amendment under the initiative obviously must comply with the procedure and the limitations on amendment set out in section 3 before it can be submitted to the electorate. As this court has observed: "The constitution is the supreme law, and every citizen is bound to obey it and every court is bound to enforce its provisions. It is a most extraordinary doctrine that the court has a discretion to enforce or not enforce a provision of the constitution according to its judgment as to its wisdom or whether the public good will be subserved by disregarding it." *People ex rel. Miller v. Hotz,* 327 Ill. 433, 437.

This was expressed, too, in Cooley's Constitutional Limitations, where it was said:

> "But the will of the people to this end can only be expressed in the legitimate modes by which such a body politic can act, and which must either be prescribed by the constitution

whose revision or amendment is sought, or by an act of the legislative department of the State, which alone would be authorized to speak for the people upon this subject ***." 1 Cooley's Constitutional Limitations, 84-85 (8th ed. 1927).

A taxpayer's suit, as was brought here, to enjoin the disbursement of public moneys (Ill. Rev. Stat. 1975, ch. 102, pars. 11 through 18) is an appropriate proceeding to determine whether proposed amendments by initiative meet requirements of article XIV, section 3. In *Allen v. Powell,* 42 Ill. 2d 66, 68, this court stated: "It has been held that injunctive relief will be granted to prevent a waste of public funds by the holding of an election under an unconstitutional election statute. (*Moran v. Bowley,* 347 Ill. 148; *Niebling v. Town of Moline,* 8 Ill. 2d 11.) It follows that any election called in violation of the constitution likewise may be restrained and an action for injunctive relief is a proper remedy." See also *McAlpine v. Dimick,* 326 Ill. 240, 250-51.

The parties stipulated that approximately $1,750,000 in public funds would be spent to determine the sufficiency of the petition and to conduct the election on the three proposed amendments. Had this court postponed its consideration of the question presented here until the proposals had been submitted and then determined that the proposals did not meet the requirements in section 3 for amendment, almost $2 million in public funds would have been wasted. Further, even if it could be said that substantive constitutional questions of due process and equal protection under the proposed amendments were not ripe for determination (see Annot., 19 A.L.R.2d 519 (1951)), the question of whether the proposed amendments met the requirements of the initiative under our constitution were directly before us. No future events or consideration would or could sharpen or better define this issue for our decision.

We would observe that other jurisdictions have held it

proper to enjoin the holding of citizens' referenda on proposed amendments which did not comply with amending provisions of their constitutions. See *McFadden v. Jordan* (1948), 32 Cal. 2d 330, 196 P.2d 787; *Mathews v. Turner* (1931), 212 Iowa 424, 236 N.W. 412; *Cohen v. Attorney General* (1968), 354 Mass. 384, 237 N.E.2d 657; *Moore v. Brown* (1942), 350 Mo. 256, 165 S.W.2d 657; *Leach v. Brown* (1957), 167 Ohio St. 1, 3 Ohio Op. 2d 346, 145 N.E.2d 525.

It appears plain, too, that it was the intention of the constitutional convention that the courts were to determine whether constitutional requirements for a proposed amendment were satisfied. Delegate Louis Perona was the spokesman for the majority on the Committee on the Legislature, concerning the initiative process for amendments to the legislative article. In discussing the permissible scope of proposed amendments he was questioned by Delegate David Connor concerning possible abuse of the initiative procedure. There was this colloquy:

> "MR. CONNOR: *** Somebody describes by petition that this is an amendment of the legislative article; who says it isn't?
>
> * * *
>
> MR. PERONA: *** I think the courts could iron out those questions and protect against abuse." (4 Record of Proceedings, Sixth Illinois Constitutional Convention 271 (hereafter cited as Proceedings).)

Later Delegate Dawn Netsch questioned Mr. Perona as to that portion of article XIV, section 3, which provides that the procedure for determining the validity and sufficiency of the initiative petition shall be provided by law.

> "MRS. NETSCH: *** If we assume that the provision of law would be that these petitions will be presented to some state election authority, or if there's a state electoral board, or whatever it may be, to determine their validity and sufficiency, I wonder whether the determination of validity and sufficiency of the petition would give that agency the right, also, to make a determination as to whether or not the proposed amend-

ment was within the substantive context of this section; in other words, whether it was, in fact, one that dealt with the structural and procedural subjects of the legislative article. \*\*\*

MR. PERONA: I think I understand the question. We didn't intend that.

\* \* \*

MRS. NETSCH: Then whatever agency is created by law with the authority to test those, it would be limited to the technical requirements; and would that, then, mean that any inquiry into whether or not the proposed amendment was within the subject matter of the constitutional initiative—that is, one dealing with structural and procedural requirements—would be determinable, if at all, only by the courts? It could not be determined by an election agency. Is that correct?

MR. PERONA: That was my intention, yes." 4 Proceedings 2712.

We believe that what we have said above answers the defendants' other contention that the plaintiffs should have proceeded under either section 23—24 of the Election Code or section 28—1.2 of the Code (Ill. Rev. Stat. 1975, ch. 46, pars. 23—24 and 28—1.2). The determination of whether a proposed amendment meets the Constitution's requirements for amendment is a question for the courts, not for an agency. In any event section 23—24 is not pertinent here. It pertains to contests of results of public referenda on proposed constitutional amendments that were submitted to the electorate. This court has held that under the predecessor to section 23—24 (see Ill. Rev. Stat. 1941, ch. 46, par. 120), "only the result of an election as determined by the returns or count of the ballots, and not the validity of the election, may be contested." *Sanders v. Township of Salem*, 385 Ill. 362, 364; accord, *Mayes v. City of Albion*, 374 Ill. 605, 608.

The defendants next argue that the circuit court placed an erroneous construction on the second sentence of section 3 which provides: "Amendments shall be limited to structural and procedural subjects contained in article IV." The circuit court interpreted this sentence as

requiring that any proposed amendment must be to effect changes in both the structure and procedures of the General Assembly. The defendants contend that section 3 permits amendments to either structural or to procedural subjects set out in article IV, which is the legislative article. They say any matter now within article IV pertains to the structure or procedures of the General Assembly and is subject to amendment by popular initiative.

In determining the intention and the purpose under-lying a constitutional provision the language used should be given its plain and commonly understood meaning unless it is clearly evident that a contrary meaning was intended. (*Hamer v. Board of Education,* 47 Ill. 2d 480, 486; *Locust Grove Cemetery Association v. Rose,* 16 Ill. 2d 132, 139; *People v. Illinois Central R.R. Co.,* 273 Ill. 220, 223; *Law v. People ex rel. Huck,* 87 Ill. 385, 393.) Generally, the rules of statutory construction apply to the construction of constitutional provisions. (*Johnson v. State Electoral Board,* 53 Ill. 2d 256, 258-59.) One contending that language should not be given its natural meaning understandably has the burden of showing why it should not. Sutherland states:

> "One who contends that a provision of an act must not be applied according to the natural or customary purport of its language must show either that some other section of the act expands or restricts its meaning, that the provision itself is repugnant to the general purview of the act, or that the act considered in pari materia with other acts, or with the legislative history of the subject matter, imports a different meaning. If the language is plain, unambiguous and uncontrolled by other parts of the act or other acts upon the same subject the court cannot give it a different meaning. But the customary meaning of words will be disregarded when it is obvious from the

act itself that the legislature intended that it be used in a different sense than its common meaning." 2A Sutherland, Statutory Construction 49 (4th ed. 1973).

Of course, the conjunction "and" expresses the relation of addition. (Webster's Third New International Dictionary 80 (1961); *City of LaSalle v. Kostka,* 190 Ill. 130, 137.) The defendants would have us read "and" as "or" in construing section 3. There is no doubt that sometimes there will have been a legislative use of "and" when "or" was intended. (*Pechous v. Slawko,* 64 Ill. 2d 576, 588.) But this occurrence is unusual. This court stated in *Gar Creek Drainage District v. Wagner,* 256 Ill. 338, 345: "It is true that the word 'and' is sometimes substituted for 'or' in the construction of statutes or contracts or wills to effectuate the intention of the parties, but it is only in cases where the intention is clearly manifested and it is apparent that to construe the word according to its real meaning would involve an absurdity or produce an unreasonable result." Accord, *Campbell v. Prudential Insurance Co.,* 15 Ill. 2d 308, 311; *People ex rel. Fix v. Trustees of Northwestern College,* 322 Ill. 120, 124; *Voight v. Industrial Com.,* 297 Ill. 109, 114.

This is a difficult burden for one who says that language should not be given its common meaning, but it is proper it should be difficult. Individuals and bodies, as a convention or a legislature, can hardly be said to intend that language they use is to be given an opposite meaning. In *People ex rel. Watseka Telephone Co. v. Emmerson,* 302 Ill. 300, this court was asked to construe article XI, section 3, of the Constitution of 1870 and read "or" as "and." The court in refusing stated:

"While courts of justice will transpose a clause and use the word 'and' for 'or,' or 'or' for 'and,' in cases where it is absolutely necessary so to do, [citations] we can say in this case *** that

it is unreasonable to argue that the convention intended the word 'and' instead of 'or.' " 302 Ill. 300, 306.

The constitutional convention used "and" to limit initiative proposals under article XIV, section 3. As commonly understood, the word "and" would thus limit initiatives to amendments whose subjects would be both structural and procedural, such as a proposal for the conversion from a bicameral to a unicameral legislature or for the conversion from multiple- to single-member legislative districts. Giving effect to the language of section 3 would produce no absurdity or unreasonable result. This court is without authority to substitute "or" for the "and" the constitutional convention used in stating "structural and procedural" unless a contrary intention is clearly manifested. We judge a contrary intention is not clearly manifested.

We would observe, too, that if one were to read section 3 as if it contained the disjunctive "or" instead of "and" the effect would be the same as if the section read: "Amendments shall be limited to *** subjects contained in article IV." The drafters of the Constitution, if the defendants' construction of the section were adopted, would have unnecessarily used the words "structural and procedural," for any change in the article would be either structural or procedural in character. This unnecessary language would have to be considered surplusage. However, the language of the drafters cannot be so facilely disregarded. This court said in *Hirschfield v. Barrett,* 40 Ill. 2d 224, 230: "The presence of surplusage, however, is not to be presumed in statutory or constitutional construction [citations], and the fundamental rule that each word, clause or sentence must, if possible, be given some reasonable meaning [citations] is especially apropos to constitutional interpretation." See also *Oak Park Federal Savings and Loan Association v. Village of Oak Park,* 54 Ill. 2d 200, 203.

The parties have cited portions of the proceedings of the 1970 constitutional convention to support the contention of each as to what was the intention of the Constitution's drafters on this question. "While in construing the constitution the true inquiry concerns the understanding of the meaning of its provisions by the voters who adopted it, still the practice of consulting the debates of the members of the convention which framed the constitution has long been indulged in by courts in determining the meaning of provisions which are thought to be doubtful." *People ex rel. Keenan v. McGuane,* 13 Ill. 2d 520, 527, *cert. denied,* 358 U.S. 828, 3 L. Ed. 2d 67, 79 S. Ct. 46; accord, *Paper Supply Co. v. City of Chicago,* 57 Ill. 2d 553.

There has not been a prior constitution of Illinois which provided for its amendment by any form of popular initiative. The only methods of amendment have been by proposals originating in the General Assembly or by convention calls. See Ill. Const. 1818, art. VII, sec. 1; Ill. Const. 1848, art. XII, secs. 1 and 2; Ill. Const. 1870, art. XIV, secs. 1 and 2.

At the 1970 convention the majority of the Committee on Suffrage and Constitutional Amendments declined to propose a general initiative which would have allowed the amendments of any part of the Constitution by initiative. The committee's report indicated that it considered that a general initiative was unnecessary since the other procedures for amending the Constitution were to be liberalized, including the automatic, periodic submission to the electorate of the question of calling a constitutional convention. (See Ill. Const. 1970, art. XIV, sec. 1.) The report further expressed concern that a general initiative provision would be subject to abuse by special interest groups and might result in hasty and ill-conceived attempts to write what should have been the subject of ordinary legislation into the Constitution. 7 Proceedings 2298.

A minority of the committee through its report did

propose a general initiative, but it was rejected by the convention. (2 Proceedings 587.) At that time delegates expressed the same concerns that may have led the majority of the Committee on Suffrage and Constitutional Amendments to reject the general initiative proposal. 2 Proceedings 581-82.

During the debates on the general initiative proposal, Delegate Perona stated that he considered it important that some form of constitutional initiative be developed to amend the legislative article, since self-interest might make it unlikely that the legislature itself would propose changes. He said: "[I] f we are dependent upon an amendment suggested by the legislature to reduce its size or to abolish cumulative voting or possibly to change to a unicameral legislature, I don't think we are going to get it done." 2 Proceedings 583.

Article XIV, section 3, was originally proposed as section 15 of the legislative article by the Committee on the Legislature. The committee's explanation which accompanied the proposal made it clear that it was intended that the Constitution's initiative process of amendment could not be used as a substitute for legislative action. The report stated:

> "Any amendment, so proposed, would be required to be limited to subjects contained in the Legislative Article, namely matters of structure and procedure and not matters of substantive policy.
>
> \* \* \*
>
> Debate in this Convention on the Constitutional Initiative revealed two serious weaknesses in the Constitutional Initiative process found in several states: (1) it permits legislation by constitutional amendment; and (2) it allows the constitutional amending process to become embroiled in highly emotional and complex issues which often cannot be adequately and clearly explained to the voters.
>
> Neither of these two serious weaknesses can be attributed to the proposed Constitutional Initiative for the Legislative Article. All proposed Constitutional

amendments submitted through use of this proposal would be expressly limited to subject matter specifically contained in the Legislative Article. The subject matter contained in the proposed Article pertains only to the basic qualities of the legislative branch—namely structure, size, organization, procedures, etc." (6 Proceedings 1400-01.)

And of particular significance there it was said:

"Section 15 specifically limits amendments to 'structural and procedural' subject matter. Clearly the subject matter of the proposed article could not be construed to permit initiative amendments of a statutory nature. Clearly, the subject matter of the proposed article is not laden with the highly complex and emotion-charged issues which have plagued the constitutional initiative process in other states." 6 Proceedings 1401.

The committee's proposal was presented to the convention by Delegate Perona. Illustrating that the proposed initiative was to be limited in the legislative changes it could effect he explained: "We feel that it's unlikely that the legislature would propose an amendment reducing the number of legislators or in changing from cumulative voting as we have today to single-member districts." (4 Proceedings 2710.) He continued, saying that the proposal would avoid the major defect shown in the general initiative in other States where it has been abused and used to introduce emotion-provoking subjects into the Constitution which should have been introduced through the legislative process. (4 Proceedings 2710.) Delegate Connor then presented this question:

"MR. CONNOR: Delegate Perona, the first few words say, 'Amendments to the legislative article.' How does one describe what an amendment to the legislative article is? Additions would be amendments—new sections, and so on—how do you limit what can be amended by this route? Somebody describes by petition that this is an amendment of the legislative article; who says it isn't?

MR. PERONA: That's a good question. We attempted to limit the legislative article—as you have seen now by the fourteen sections that have preceded this

one—to the legislature itself, to its structure, makeup, and organization, and details concerning it. Are you specifically referring to the possibility of adding sections similar to those in the 1870?

MR. CONNOR: Well, lots of things have sailed under the colors of being legislative-article additions, and I just wonder what meaning then it has to say, 'additions to the legislative article.'

MR. PERONA: Well, the report indicates that we intend to limit this to the sections—to the sections presently—the type of sections presently in the legislative article. ***" (4 Proceedings 2711.)

There was then a colloquy between Delegates Perona and Tomei which indicated that the amending process would allow changes in legislative structure, composition, cumulative voting and even a change to a unicameral legislature. (4 Proceedings 2711-12.) Delegate Perona explained later that proposed amendments would be limited in nature. He said in part:

"This provision has been structured to apply only to the legislative article and to be limited to the area of government which it is most likely will not be changed in the constitution by amendment. The legislature, being composed of human beings, will be reluctant to change the provisions of the constitution that govern its structure and makeup, the number of its members, and those sort of provisions.

\* \* \*

As I indicated preliminarily in my remarks, I think the limitation on this initiative eliminates the abuse which has been made of the initiative in some states. The attempt has been made here to prevent it being applied to ordinary legislation or to changes which do not attack or do not concern the actual structure or makeup of the legislature itself." (4 Proceedings 2911.)

The proposal was then approved by the convention at the first reading and submitted to the Committee on Style, Drafting and Submission. 4 Proceedings 2915.

The initiative as it was approved by the convention at first reading appears in volume 6 at page 1560, and at page 1561 is the report or "explanation" of it by the

Committee on Style, Drafting and Submission. While the committee's report is not entirely unambiguous, one could conclude from it that the initiative section was read to mean there could be amendments as to structural subjects or as to procedural subjects. Comments made by the committee's chairman, Delegate Wayne Whalen, appear to express that view. (5 Proceedings 4523, 4547.) However, even if that were the view of that committee, considering all of the circumstances relating to the intendment underlying the disputed language on this question we consider on balance that the intendment was to limit amendments to those which would affect both structure and procedure. The Committee on Style, Drafting and Submission was not a substantive committee of the constitutional convention; it was one of three procedural committees. (The others were Public Information and Rules and Credentials Committees.) The Legislative Committee, which proposed the initiative, was a substantive committee. (6 Proceedings viii, ix.) The Committee on Style, Drafting and Submission, as its name indicates, was concerned with matters of style and form (*e.g.,* 2 Proceedings 394-396), rather than of substance. This of course is in no way meant as a depreciation of the important function of the Committee on Style, Drafting and Submission. It is intended only to point out that the committee did not have the function or responsibility of proposing substantive matters for inclusion in the Constitution.

We would add that if the view apparently taken in the report of the Committee on Style, Drafting and Submission were accepted it would enormously broaden the initiative. To read "structural and procedural" as "structural or procedural" would allow the submission of proposed amendments to the electorate whenever proposals were related to the procedure of the General Assembly. Such a construction would allow the amending process to be used to introduce ordinary legislative

subjects. There would be "initiative amendments of a statutory nature," which the Committee on the Legislature, as we have noted earlier, clearly said would not be possible because "Section 15[3] specifically limits amendments to 'structural and procedural' subject matter." 6 Proceedings 1401.

The defendants do not attempt to argue that the proposals meet these dual requirements. The proposed amendments did not meet the constitutional prescriptions, and the circuit court properly granted the plaintiffs' motion for summary judgment.

It is not inappropriate to observe that it is obvious, of course, that one can read "structural and procedural" so as to give "and" a disjunctive effect. But as this court not unreasonably has held, the circumstances under which a court is justified in not giving language its ordinary meaning are limited. (*Gar Creek Drainage District v. Wagner* (1912), 256 Ill. 338, 345.) The plaintiffs, who were members of the constitutional convention and in a position to know the mind of the convention, declare that "and" was not to be given a disjunctive meaning.

Justice Brandeis is reported to have observed that some questions can be decided, even if not completely answered. The process of decision, he said, does not demand that one point of view be accepted as entirely right and the other rejected as entirely wrong. It is sufficient that the scale of judgment tips. We judge that the scale has tipped in favor of the plaintiffs' position.

Because of our holding in cause No. 48758, that the proposed initiative amendments did not meet the requirements of article XIV, section 3, and, therefore, may not be submitted to the electorate for approval, we dismissed the petition for *mandamus* in cause No. 48746, to compel the State Board of Elections to certify the initiative petitions.

For the reasons given, the judgment of the circuit court in cause No. 48758 was affirmed, and in cause No. 48746 the petition for a writ of *mandamus* was dismissed.

*48746 — Petition dismissed.*
*48758 — Judgment affirmed.*

MR. JUSTICE SCHAEFER, dissenting:

The critical sentence in section 3 of article XIV of the Constitution says: "Amendments shall be limited to structural and procedural subjects contained in Article IV." The majority has rewritten this sentence to make it read: "Every amendment shall include both structural and procedural subjects contained in Article IV." It has done so, apparently, because it has concentrated upon the conjunctive aspect of the word "and," to the exclusion of another, more natural meaning in this context. The artificial quality of the result reached by the majority becomes apparent from a consideration of comparable sentence structures:

> First year students are limited to mathematics and foreign language courses.

> The menus will be limited to beef and chicken dishes.

It seems plain that the first illustration does not mean that both mathematics and a foreign language must be taught in a single course, and that the second illustration does not mean that every dish must contain both beef and chicken.

This customary usage of the word "and" not only makes sense; it is recognized in Webster's Third New International Dictionary: "reference to either or both of two alternatives (choose between him *and* me) esp. in legal language when also plainly intended to mean *or* (bequeathed to a person *and* her bodily issue) (property taxable for state *and* county purposes)." In both of the illustrations in Webster, the word "and" clearly means "or," just as it does, in my opinion, in the critical sentence used in the Constitution. I do not find anything in the proceedings of the constitutional convention which suggests that no change in any of the numerous procedural provisions of article IV can be brought about by initiative unless the same amendment brings about a change in the structure of the legislative body.

The majority also concludes that any change in the legislative article "would be either structural or procedural in character." (65 Ill. 2d at 466.) This is by no means a necessary conclusion, and I think it is erroneous. It

deprives the words "structural and procedural" of all significance, for the sentence would have the same meaning if they were omitted. It would then read: "Amendments shall be limited to subjects contained in Article IV." It is true that the conclusion of the majority finds some support in the Report of the Legislative Committee, but it is also true that other parts of that same committee report point in the other direction: "The subject matter contained in the proposed Article pertains only to the basic qualities of the legislative branch—namely structure, size, organization, procedures, etc." (6 Proceedings 1401.) Some of the provisions of article IV plainly do not relate to either procedural or structural matters. For example:

> "(e) No member of the General Assembly shall receive compensation as a public officer or employee from any other governmental entity for time during which he is in attendance as a member of the General Assembly.
>
> No member of the General Assembly during the term for which he was elected or appointed shall be appointed to a public office which shall have been created or the compensation for which shall have been increased by the General Assembly during that term." (Ill. Const. 1970, art. IV, sec. 2(e).)

The basic grant of legislative power in section 1, and the grant of legislative immunity in section 12 of article IV, are neither "procedural" nor "structural," and there are other provisions in article IV which would not fit comfortably in either of those categories.

What the constitutional convention feared was that the initiative procedure which it was authorizing might be misused to accomplish "substantive changes." For example, amendments reading: "The General Assembly shall never pass a law abolishing the death penalty" or "The General Assembly shall enact legislation which will prohibit abortions" could arguably be regarded as amendments to the legislative article since they bear

directly upon the power of the legislature. It was to avoid that kind of amendment that the convention decided to limit the subject matter of amendments proposed by popular initiative. The words used to accomplish that result effectively cut off amendments which would affect the power of the General Assembly, but I find no intention either in the reports of the committee or in the debates to require that an amendment by initiative to the legislative article must deal simultaneously with both procedural and structural subjects.

The fact is that the constitutional convention had presented to it, but failed to adopt, a revision of the sentence in question which would have expressed the construction now adopted by the majority of this court. Just before the final vote on the adoption of article XIV the following occurred:

"MR. LEWIS: I have a question of Delegate Whalen, and perhaps Delegate Tomei could also give his opinion. On page 69 of section 3, we state: 'Amendments shall be limited to structural and procedural subjects.' There was some feeling by some of the staff that perhaps those things ought to be itemized. Do either or both of them feel that those words are sufficiently descriptive to restrain constitutional initiative to the matter of function and not to the matter of substance or change in other articles?

PRESIDENT WITWER: May we come to order, please? Do you care to answer, Mr. Whalen?

MR. WHALEN: I think so. We had a proposed recommendation, if you recall, on second reading that wasn't adopted, that would further limit this, but I think this still accomplishes the result.

PRESIDENT WITWER: Thank you.

MR. LEWIS: Peter, do you also agree?

MR. TOMEI: Yes, I don't think this extends to substantive legislation. I think that's your question.

MR. LEWIS: That is my question, I wanted it on the record. Thank you. Mr. President." (5 Proceedings 4547.)

The amendment referred to in this passage would have changed the critical sentence to read: "Amendments

proposed by petition shall be limited to the structure of the General Assembly and to procedural provisions affected by changes in structure." (6 Proceedings 1561.) That amendment, which the constitutional convention did not adopt, is now adopted by the majority opinion of this court.

Because of the way in which it rewrote the key sentence, the majority apparently felt that it was unnecessary to consider whether the specific amendments involved in this case relate to structural or procedural subjects. In my view of the meaning of the constitutional provision, it is necessary to do so. In my opinion, neither Proposal No. 1 nor Proposal No. 3 (65 Ill. 2d at 458) relates to a structural or procedural subject. Proposal No. 2, however, does in my judgment certainly relate to a matter of procedure, and since it affects the composition of the General Assembly in those situations to which it would apply, it involves a structural subject also.

Obviously, my views on this matter are quite unrelated to my opinion as to the desirability or undesirability of any of these proposals.